UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CLIFTON STEPHNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:07-cv-0814-DFH-TAB |
| | ) | |
| TARGET CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Clifton Stephney was employed as an Executive Team Leader ("ETL") of Logistics at the Target store in Bloomington, Indiana. Despite good to excellent performance reviews, Stephney was fired on November 17, 2006. The decision was made by store manager Jennifer Mayer. Her stated reason was that Stephney was condoning off-the-clock work by an hourly employee. Stephney is a forty-two year old African-American who has now brought claims under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act. Target has moved for summary judgment, arguing that Stephney's off-the-clock conversations with an hourly employee were its sole grounds for termination. Its motion is denied. Stephney has come forth with sufficient evidence that Mayer and Target were attempting to eliminate older and

African-American employees and that off-the-clock communications, despite written policies banning them, were widespread and part of the company culture.

## Standard for Summary Judgment

Summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The motion should be granted if no rational fact finder could return a verdict in favor of the non-moving party.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A court's ruling on a motion for summary judgment is akin to that on a motion for directed verdict.  The essential question for the court on both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  When ruling on the motion, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Id.* at 255.

## The Record for Summary Judgment

Target complains that Stephney's statement of material facts in dispute does not comply with Local Rule 56.1 and that his reliance on certain affidavit statements is inappropriate.  A plaintiff who bears the burden of proof should be free to craft his statement of facts in a coherent manner for the court.  If that

involves a little repetition of matters the defendant also stated, so be it.  Target's assertion that Stephney's fact statements "misrepresent the evidence" is simply unfounded.  Stephney is free to highlight the facts in a light most favorable to him. He has no affirmative obligation to list mitigating circumstances.  None of the material facts asserted by Stephney were misleading.  Target's complaints about various affidavits submitted by Stephney are not persuasive.   The "bald assertions" pointed out by Target might have been insufficient on their own to defeat summary judgment, but they provide part of a larger web of custom and practice evidence for which specific details have been provided by Stephney. Defendant's objection to Stephney's use of only Cathy Tipp's 2007 affidavit is baseless.  Her 2008 affidavit (given to Target's counsel), while limiting her 2007 sworn statement (given to Stephney's counsel), does not refute it.  Even if there were a direct conflict, Stephney receives the benefit of any conflict when the court considers Target's motion for summary judgment.

## Facts for Summary Judgment

The following statement of facts is not necessarily accurate in all respects but reflects the application of the standard for summary judgment to the designated evidence, giving plaintiff the benefit of conflicts in the evidence and all reasonable inferences in his favor.  Pursuant to Local Rule 56.1, the court has assumed as accurate any material facts set forth in defendant's brief that were

appropriately supported if they were not specifically identified as disputed by plaintiff with appropriate references to supporting evidence in the record.

Turning to the facts, Stephney was first employed by Target in 2002 as an ETL of Replenishment in California.  He left Target in 2003.  After relocating to Bloomington, he was hired again in December 2003 in the same position at a new store.  In September 2005, he was promoted to ETL of Logistics.  The ETL of Logistics is a salaried supervisory position that reports to the store manager.  In this position, Stephney worked overnights.  He was in charge of the merchandise stocking process, which occurs after hours when no customers are present.

Stephney's performance reviews at the Bloomington store were all good to excellent.  He was reviewed twice annually.  His annual reviews for 2004 and 2005 were both "exceptional."   Mayer Dep. 16-17; Dep. Ex. 4, 6.   He also "met expectations," the higher of two possible designations, on all of his mid-year reviews.  He received his last mid-year review on October 9, 2006.  The mid-year review stated:  "Mr. Clifton [–] wow [–] what a outstanding growth year for you. You successfully took the logistics score to 100%, developed a solid team and have produced some outstanding results . . . I am proud of your accomplishment." Mayer Dep. 17, Dep. Ex. 7 at 1.  District Manager Laureen Budd, who oversaw multiple stores, sent notes to Stephney complimenting the Logistics department in both September and November 2006.  Stephney Aff. Ex. 1.

All of Stephney's reviews at the Bloomington store were given by Rick Bontekoe, who was store manager from Stephney's date of hire until September 1, 2006.  Bontekoe prepared the 2006 mid-year review, but it was actually given to Stephney by Mayer, Bontekoe's replacement.  Mayer became Stephney's official supervisor on September 1, 2006, although she came to the Bloomington store on July 24, 2006.  Both Mayer and Bontekoe are Caucasians.  Mayer was born in 1973.  The entire time Stephney was employed at the Bloomington Target, he was the only African-American ETL in Bloomington.  Stephney Aff. ¶ 3.  Target has hired one African-American ETL in Bloomington since Stephney's termination.

In Stephney's experience at both the California Target store and under Bontekoe, the Executive Team Leader of Replenishment reported to the ETL of Logistics.  In July 2006, Jennifer Heronemus, a Caucasian female born in 1978, was hired as the ETL of Replenishment and reported to Stephney.[1]  After Mayer became store manager, she made Heronemus co-ETL of Logistics with Stephney.  Don Price, a Caucasian born in 1975, was later put in charge of the dayside Logistics staff, a responsibility previously held by Stephney.  Both Stephney and Heronemus worked nights.

Stephney was formerly the only head of Logistics, but after Mayer's appointment and Heronemus' promotion, he began to feel that his instructions to Logistics team members were being undermined by Heronemus or Price.  He

---

[1]Heronemus has since married and changed her name to Jennifer Dixon.

complained about the lack of authority to Mayer, who told him that decisions should be made by majority rule among Stephney, Price, and Heronemus.   On November 1, 2006, Stephney complained to Mayer about Price and Heronemus undermining his decisions.   Mayer responded that they were younger and could relate to each other, while Stephney was older with a family and might not be able to relate to them.   Stephney Dep. 209-10.

Mayer's reference to Stephney's age on November 1, 2006 was not the first time the subject had come up in her short time as Stephney's supervisor.   Around the time that she took over as store manager, she saw a picture of Stephney's family on his desk and asked how old he was.   When he told her he was forty, she commented that he was older than she was.   Although that last comment was obviously innocuous by itself, Mayer had also terminated Bobette Mucherheide, an employee over fifty years old whom Stephney had supervised.   Mayer told Stephney that Mucherheide was "too old and slow to be a team leader."   Stephney Aff. ¶ 20.[2]   Stephney believes that Mucherheide "was not slow, she was a significant contributor to the logistics department being number 1."   Stephney Aff. ¶ 24.

---

[2]Stephney in his deposition was pushed on whether or not that was a direct quotation.  He said:  "I'm not going to quote those exact words, but she said she was too old – yeah , well – yeah, I think she said she's too old and too slow, but I'm not quoting anyone."  Stephney Dep. 204.  He quotes "too old and slow" in his affidavit.

Mayer also made a comment about race that is relevant here.  In October 2006, Mayer asked Stephney what the word on the floor was about her.  Stephney told her that team members were concerned Target was getting rid of minorities and older employees.  Mayer responded that Target did not have to have minorities in leadership positions, merely in some capacity in the store.  Stephney Dep. 219-22.

Stephney was terminated on November 17, 2006.  The official reason given was "Gross misconduct – condoning unauthorized work – knowingly permitting a team member to perform work off the clock, whether on or off company premises."  Mayer Dep., Ex. 8.  Target's official rules clearly prohibit supervisors from condoning off-the-clock work by hourly employees.  Stephney admits that he had been presented multiple times with this policy.  The stated cause in Stephney's case stems from communications between Stephney and Matthew Ward, an hourly team leader in the logistics department who reported to Stephney.  Before Heronemus moved to the night shift, Stephney relied on Ward to run the overnight process on Stephney's days off.  Stephney Dep. 69-70; Ward Dep. 4-5. Stephney would call Ward on days when Ward was not working the night shift.  Ward himself never complained directly to management about the contacts, and he affirmatively states that he "never said [Stephney] made excessive or lengthy phone calls to my home about work."  Ward Aff. ¶14.

Heronemus began working the night shift in September.  She reported to Mayer that Stephney was calling Ward when Ward was off of the clock.  On September 25th, Mayer had a conversation with Stephney about his phone calls to Ward.  Stephney admits that Mayer did not want him to call Ward, but not because of the off-the-clock violations.  Stephney claims that Mayer told him that Target was trying to get rid of Ward and was having Heronemus coach him on a nightly basis.  Mayer did not want to be sending Ward mixed signals, with Heronemus as the bad guy and Stephney the good guy.  Stephney specifically recalled:  "She never said, 'You need to stop calling him or it was a violation of company policy.'" Stephney Dep. 96.  He did, however, understand that Mayer did not want him to call Ward.

Stephney continued to call Ward despite the conversation with Mayer.  The calls were brought to Mayer's attention again, this time by Carri Engledow.  Engledow told Mayer that Ward had expressed concerns about being called at home on work-related issues.  Mayer Aff. ¶ 6.  Mayer met with Ward and Engledow and emailed her own supervisor, Laureen Budd, with the results.  This email stated that Ward told her that Stephney called at one point seven days a week, but now about twice a week.  The email further stated that "they talk for 20 minutes about the trailer, how the night went, backstock, and the team."  Ward does not claim time worked during these conversations.  The email also said that Mayer coached Stephney and Heronemus on September 25th and October 10th.  Ward Dep., Ex. 1.

Several parts of this email are disputed.  First, both Stephney and Ward insist that the amount of time talking about work was only a minute or two and that any additional time was just pleasant conversation.  Second, Target admits that the October 10th coaching referenced in the email did not occur on that date. Mayer now claims it took place on October 6th, but Stephney denies that it took place at all.  Mayer Dep. Ex. 12; Stephney Dep. 99.  On summary judgment, the court must accept Stephney's version.

Mayer met with Ward and Engledow again on November 13, 2006.  Ward provided two dates from his cell phone call list that came from Stephney, calling when Ward was off the clock.  Ward confirmed that the only Target employee to call him was Stephney and that the calls lasted roughly 20 minutes.  Ward was not specifically asked what portion of the 20 minutes was spent on work matters, even after Ward told Mayer that he and Stephney talked about "work and other stuff."  Ward Dep. 26.  Stephney was terminated on November 17th.

Stephney's condoning of off-the-clock work was not unique at the Bloomington Target.  Price called a number of employees off the clock and talked with Muckerheide after she clocked out on multiple occasions.  Stephney Dep. 156-64.  Stephney's predecessor as ETL of logistics, Eric Gunnell, held breakfast meetings with overnight employees after they had clocked out.  Arnold Aff. ¶ 18. He also made phone calls to an off-the-clock employee, sometimes from Bontekoe's office.  Tipp, an assistant manager in human resources, did work a

handful of times off the clock in July 2007, eight months after Stephney's termination.  Tipp Aff. 2007 ¶¶ 11-13.  Tipp also submitted a 2008 affidavit that acknowledged that she did not know whether Mayer knew about these activities.

Store manager Mayer, meanwhile, regularly stopped employees on the floor after they had already clocked out for the day, meeting with them for five to fifteen minutes.  Arnold Aff. ¶ 14.  These conversations included Brooks Arnold, Ward, Stephney, and Muckerheide.  The off-the-clock conversations with Mayer continued after Stephney's termination.  Arnold Aff. ¶ 16.  Target regional human resources representative Gabrielle Edwards investigated Stephney's charges of widespread condoning of off-the-clock behavior.  Edwards interviewed at least eight former or current team leaders or hourly team members, and none reported off-the-clock violations.  Edwards Aff. ¶¶ 12-13.

Stephney was replaced on a temporary basis by Price, but his permanent replacement as ETL of logistics was Carma Nagy, a Caucasian born in 1977.

*Discussion*

To survive summary judgment on a Title VII or age discrimination claim, a prospective plaintiff can proceed under either the direct or indirect methods of proof.  Stephney satisfies both the indirect  and direct method of proof, either one of which would defeat Target's motion for summary judgment.

I.     *Indirect Method of Proof*

The indirect method of proof is evaluated through the well-known *McDonnell Douglass* analysis.  *McDonnell Douglass Corp. v. Green*, 411 U.S. 792 (1973).  First a plaintiff must establish a prima facie case.  When a plaintiff pursues this indirect method of proof, he must offer evidence of the following:

1.     He is a member of a protected class;

2.     He was meeting the legitimate employment expectations of his employer;

3.     He suffered an adverse employment action; and,

4.     Similarly situated employees who were not members of the protected class were treated more favorably.

*Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007).  If a plaintiff succeeds in making that prima facie showing, the defendant must articulate a legitimate non-discriminatory reason for taking the adverse action.  *Id*.  If that occurs, as it does in almost every case, the burden shifts back to the plaintiff to offer evidence that the reason proffered is false.  If it is false, the trier of fact may

treat the false reason as a pretext for discrimination, *i.e.*, as evidence that the decision made by the employer was tainted by unlawful motives. *Id.* In opposing a motion for summary judgment, the plaintiff need not prove his case, but he must come forward with evidence that would allow a reasonable jury to find in his favor. Stephney has met this standard by coming forward with evidence that the practice of condoning off-the-clock work was widespread, including by Mayer herself. As a result, a reasonable jury could find that Target's stated non-discriminatory justification was only a pretext.

Under the indirect method of proof, the analyses of Stephney's race and age claims are essentially identical. He is a member of both protected classes because of his race and his age, and his termination was an adverse employment action. He has offered evidence that he was meeting Target's legitimate expectations and that other employees, notably Mayer herself, were also condoning off-the-clock work on a similar scale but were not terminated. Target contests the second and fourth prongs of the prima facie case, arguing that Stephney's condoning of off-the-clock work did not meet Target's legitimate expectations, and that no similarly situated employee was treated differently.

On the issue of reasonable expectations, Stephney does not deny that he made the contacts with Ward or that the contacts were against official policy. Target does not deny that, other than the phone calls to Ward, Stephney was a good employee. As is often the case in issues of discipline that was allegedly

discriminatory, the analysis of whether the plaintiff was meeting legitimate employment expectations effectively merges with his pretext claim and will be discussed in that analysis below.  See, *e.g.*, *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 807 (7th Cir. 1999) (noting that the reasonable expectation prong "dovetails with the issue of pretext" and addressing the issue in the pretext analysis).  The critical issue is whether the type of contacts that Stephney had with Ward were unusual or whether other employees engaged in similar activity without similarly severe consequences.

Target argues that no similarly situated employees were treated differently. First, Target argues that since Mayer fired Stephney, only her actions are relevant. Of course, Mayer was store manager for less than three months before firing Stephney.  The evidence of conduct when Bontekoe was store manager, as well as any evidence from Stephney's time in California, arguably shows a broader company-wide, or at least store-wide policy, of making minimal contacts with employees off-the-clock.  These contacts outside of Mayer's tenure as store manager, however, are not necessary to defeat Target's motion for summary judgment.

Target's other argument is that Stephney's contacts with Ward, which were on the phone, are not analogous to the alleged in-store contacts that Stephney emphasizes.  Target's proffered reason for Stephney's termination, however, is based on the company's policy against condoning off-the-clock work.  In that

sense, the relevant inquiry is how other employees were treated with regard to violations of the policy against condoning off-the-clock work.  See *Freeman v. Madison Metropolitan School Dist.*, 231 F.3d 374, 383 (7th Cir. 2000) (holding that employees were similarly situated if subject to the same policy, even though plaintiff had a knee injury rather than a back injury).  On this score, Stephney easily makes a prima facie case.  Multiple witnesses have testified that Mayer herself would sometimes meet with off-the-clock employees for five to fifteen minutes.  In addition, Tipp on multiple occasions did work while off-the-clock. The ETL associates involved in those cases were all less than 30 years old, and three out of four were white.  Tipp Aff. 2007 ¶¶ 14-17.

Target argues that Mayer is not comparable to Stephney because she did not know that she was condoning off-the-clock work.  For the sake of making out a prima facie case, however, Stephney will not be stopped as a matter of law by Mayer's mere assertion that she did not know she was participating in the same activity that she claims led her to fire Stephney.  Stephney has offered sufficient evidence about the frequency, location, and manner of the discussions to support a reasonable inference that Mayer knew that these employees were not on the clock.  For purposes of summary judgment, therefore, the court must assume that Mayer is claiming that she fired Stephney for engaging in the same conduct that she engaged in herself.

Stephney has presented a prima facie case, but Target easily responds with a facially legitimate non-discriminatory reason for his termination, condoning off-the-clock work.  Stephney needs to come forth with evidence that this explanation is merely a pretext.  Stephney easily meets this burden as well, based on Mayer's repeated off-the-clock communications and the evidence of a wider culture condoning at least minimal off-the-clock work.   In particular, the repeated instances where Mayer engaged in similar conduct make her role as the decision-maker in Stephney's termination particularly suspect.  Stephney has even offered evidence that Mayer continued to talk to employees off-the-clock after she fired him.  Arnold Aff. ¶ 16.

With regards to Mayer's motivation, Target raises two principal points. First, Target argues that Mayer had an honest belief that Stephney was calling Ward off-the-clock and talking to him for an average of twenty minutes.  The actual work conversations were only for one or two minutes, but Mayer asserts that she was unaware of this and knew only the 20 minute figure.  This argument is for the jury.  Whether or not Mayer "honestly held" this belief, Stephney's termination in a culture where off-the-clock conversations were widespread raises an issue of fact about the real motivation for his termination.  Nobody contests that, under a strict interpretation of Target's policy on off-the-clock work, Stephney could have been fired.  The problem, however, is that the rules were apparently widely disobeyed, and yet, the one African-American ETL who was also over forty years old was the only one to be fired for condoning off-the-clock work.

Target's second argument is that Mayer herself did not know that she was talking with employees who were off the clock.  Construing the evidence in a light most favorable to Stephney, this assertion cannot support summary judgment. Mayer would talk to employees who had clocked out, some of whom were leaving work wearing their coats.  She argues that a clock near the door could be used to clock out, but multiple witnesses testified that Mayer delayed them after they had clocked out.  Arnold Aff. ¶10; Ward Aff. ¶ 10.  The store manager could reasonably have some understanding of the means by which her employees were clocking out and was no doubt aware of what time they were clocking out in some instances. These employees were clocking out in the back of the store and not leaving the store until five to fifteen minutes after they clocked out.  The fact that Mayer engaged in the same activity for which she fired Stephney could easily allow a jury to find that her decision to fire him for condoning off-the-clock work was mere pretext.  Target's argument to the contrary presents an issue for the jury.

Construing the facts most favorably to Stephney, the way that Ward was used in Stephney's termination also supports a finding of pretext.  Stephney recounts that Mayer only told him to stop talking to Ward so as not to undermine Heronemus.  She never told him to stop calling Ward because it was condoning off-the-clock work.  Mayer's emails about her meetings with Ward are not entirely consistent with what Ward says he told her.  Interestingly, Ward submitted an affidavit on behalf of Stephney, which is an odd stance for someone who, according to Mayer's email, was afraid of Stephney's retaliation and had his

work/life balance seriously upset.  Furthermore, despite Mayer's report of Ward being inundated by phone calls from Stephney, Ward's phone had the record of only two calls.  Ward Dep. Ex. 1.

Stephney has also raised an issue of fact about whether contacts with employees off-the-clock were part of the corporate culture at Target.  Stephney worked for two different Target stores and at least three store managers.  All to some extent talked with employees off of the clock.  In addition, the Bloomington Target was rife with off-the-clock communications in the days before Mayer.  The fact that Mayer participated in similar conduct does not signal that the corporate policy had changed at that store.

For the purposes of summary judgment, the court must assume that off-the-clock communications were widespread, participated in by Mayer herself, and part of Target's corporate culture.  In this culture, the only employee terminated for this behavior at the Bloomington Target was the store's one African-American ETL, whose age also put him in the protected class under the ADEA.  For these reasons, Stephney has met his burden of offering evidence that would allow a reasonable jury to find that Target's stated reason for firing him was a pretext.

II.    *Direct Method of Proof*

The direct method of proof does not require direct evidence or near-admissions of illegal motive by an employer. A direct method of proof case can be proved through circumstantial evidence. Relevant evidence includes:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments direct at other employees in the protected group;
>
> (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and
>
> (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007), quoting

*Sun v. Board of Trustees of Univ. of Illinois*, 473 F.3d 799, 812 (7th Cir. 2007).

Stephney meets this standard by combining the results of a series of personnel moves that stripped him of authority and a series of statements by Mayer showing a disinclination to keep in management positions older or African-American employees. While Mayer did not explicitly say that she was firing Stephney due to his race or age, a pattern of comments and actions provides sufficient circumstantial evidence that race and/or age were motivating factors behind Mayer's and Target's decision.

The evidence provided by Stephney must be read together to show a cognizable case under the direct method of proof. Some of the evidence is race-

specific and some is age-specific.  Other evidence applies equally to both claims.
First, Stephney lays out evidence that the Logistics department was running
extremely well under his stewardship before Mayer became store manager.  Mayer
nonetheless promptly eviscerated his control by creating what was effectively a
logistics management triumvirate with his subordinates, ruled by majority vote.
The other two members of this team were both white and under the age of forty.
During this same time, Mayer continually came up with reasons why Stephney did
not need to attend the weekly manager's meeting.  She also sent Heronemus on
a recruiting trip to an area where Stephney was the district recruiter.

Additionally,  Stephney and Mayer had a conversation in which he told her
that the word around the store was that Target was getting rid of minority and
older employees.  Mayer's response was that Target did not need older or African-
American employees in leadership positions.

Stephney provides even stronger evidence when it comes to his age.  Bobette
Muckerheide was on Stephney's team, and he considered her a solid worker.  She
was terminated by Mayer, who told Stephney that Muckerheide was terminated
because she was "too old and slow."  Mayer also noted that Target needed younger
and faster team leaders when viewing a help team from Indianapolis.  Mayer said
that Stephney's problems with Heronemus and Price were a result of their age
difference, and she created a system where Heronemus's and Price's views
trumped Stephney's.

Target's response to this evidence is that the comments by Mayer were mere "stray remarks." Target has overstated what a plaintiff needs to show in order to survive summary judgment under the direct method of proof. Target's theory seems to be that Mayer needed to tell someone outright that Stephney's termination was because of his age or race. The doctrine of "stray remarks" allows remarks to support an inference of discrimination if they were "(1) made by the decision-maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Hemsworth*, 476 F.3d at 491. The Seventh Circuit's recent decision in *Hasan v. Foley & Lardner, LLP*, — F.3d —, 2008 WL 5205818 (7th Cir. 2008), illuminates the sort of evidence that can be relevant for a direct method of proof case. There, the statements of a partner in the law firm a full year before the decision to fire the plaintiff were evidence of discriminatory intent. The partner had said on September 11, 2001 that Muslims should be "kicked out" of the country. Hasan, a Muslim attorney, was terminated in October 2002, but the offensive statement by the partner, who chaired the termination meeting, was relevant. "The recency of discriminatory comments, together with who made the comments and how extreme those comments were, is relevant to whether they help build a total picture of discrimination. But the district court may not view recency alone as the decisive factor." *Id.* at 7 (internal citation omitted). The remarks at issue here were all made by Mayer, the ultimate decision-maker. All were made between September and Stephney's termination in November, a matter of only two months. All support a finding that Mayer was attempting to eliminate

older or African-American employees from leadership positions, the fate suffered

by Stephney in November.

These remarks are certainly part of the circumstantial case built by

Stephney to survive summary judgment under the direct method of proof.  The

direct method of proof can be satisfied through circumstantial evidence, including

"suspicious timing, ambiguous oral or written statements, or behavior toward or

comments directed at other employees in the protected group."  *Sun,* 473 F.3d at

812.   The comments presented by Stephney are at least ambiguous oral

statements, and the comments about Muckerheide deal with behavior toward

other employees in the protected group.  In *Hemsworth*, summary judgment was

granted because the "stray remarks" were all the proof that the plaintiff had.

Those remarks, by themselves, were "insufficient to establish that a particular

decision was motivated by discriminatory animus."  *Hemsworth*, 476 F.3d at 491,

quoting *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006).

Here, the remarks at issue are part of a larger mosaic of suspicious activity

that builds a sufficient circumstantial case to raise an issue of fact about whether

race and/or age were reasons for Stephney's termination.  The fact that Mayer

theorized that she did not need to keep older or African-American employees and

then limited the responsibility of and eventually fired the one African-American

ETL who was also 40 years old "points directly" to race and/or age being a reason

for Stephney's termination.  See, *e.g.*, *Burks v. Wisconsin Dept. of Transportation*,

464 F.3d 744, 751 n.3 (7th Cir. 2006), quoting *Blise v. Antaramian*, 409 F.3d 861, 866 (7th Cir. 2005) (acknowledging that a direct case can be made through a "convincing mosaic" of circumstantial evidence).

Target also argues that the work arrangement created by Mayer that made Heronemus and Stephney equals was how she had run two previous stores and was an approved structure by Target. The addition of Price was based on the need to have someone on the day shift managing the daytime process. The transition to Price, furthermore, had an equal impact on Heronemus and Stephney.

This court will not sit as a super-personnel department for Target, which was legally allowed to create the logistics management model enacted by Mayer. At the same time, Target is not free to assert any business justification and then automatically win summary judgment. A finder of fact might determine that Mayer's business reorganization was purely for business purposes and use that determination to decide eventually that Stephney was in fact fired for his contacts with Ward. At the same time, a finder of fact could reasonably find that Mayer was uncomfortable with African-American and/or older workers and that she took authority from Stephney on account of his race and/or age. The trier of fact could then use that evidence to find that Stephney's eventual termination was based on his race and/or age. The choice between these different inferences is for the jury at trial, not for the court on summary judgment. Summary judgment must be denied.

*Conclusion*

For the foregoing reasons, Target's motion for summary judgment (Dkt. No. 41) is denied.  The final pretrial conference remains set for March 6, 2009 with trial scheduled for March 16, 2009.

So ordered.

Date: January 8, 2009

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Gregory A. Stowers
STOWERS & WEDDLE PC
gstowers@swh-law.com

Bonnie L. Martin
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
bonnie.martin@odnss.com

Kristin B. Keltner
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
kristin.keltner@odnss.com